Gorman v. Pacific Railroad.

GORMAN *et al.*, Respondents, v. PACIFIC RAILROAD, Appellant.

1. The owner of cattle is under no obligation to keep them on his own premises; if, however, he should permit them to roam at large and they should go upon the track of a railroad and be injured unavoidably, through no want of diligence and care on the part of the agents and servants of the railroad company, he would be without redress.
2. The degree of care to be exercised by a railroad company in preventing the destruction of property or other injuries must be proportioned to the dangerous nature of the means and instruments employed by it.
3. Though, as a proprietor, a railroad company is under no greater obligation to fence its road than any other owner of land is to fence the same, if the road be not fenced that fact should be considered in estimating the degree of care to be exercised by the company.
4. Railroad corporations, like natural persons, are subject to such reasonable police regulations as the legislature may prescribe for the preservation of the lives and property of the people; the legislature has power to require them to fence their roads and to erect and maintain cattle-guards at the road crossings, or to respond in damages for all injuries arising from an omission so to do, although their charters contained no reservation of such a power.
5. The 51st section of the general railroad act of February 24, 1853, (Sess. Acts, 1853, p. 121, 143,) requiring railroad corporations to erect and maintain fences along the lines of their roads where they pass through inclosed

fields, and cattle-guards at all road crossings, was applicable to and binding upon the Pacific Railroad corporation whether the provisions of said act were accepted or not by said corporation.

6. In actions to recover damages for injuries sustained through the omission of a railroad corporation to fence its road as required by section 51 of the general railroad act of February 24, 1853, the question of care and diligence on the part of the corporation, through its agents and servants, can not arise. If the road be not fenced as required by law, it matters not that the highest care is exercised by the agents of the corporation.

### Appeal from St. Louis Law Commissioner's Court.

This was an action to recover the value of three head of cattle alleged to have been killed by defendant through the negligence of its agents, in running over them a locomotive. It was further alleged that the cattle were killed at a point on the road where it ran through inclosed fields; that defendant had failed to erect and maintain fences as required by law; that the cattle were killed by reason of this failure.

The evidence showed that the cattle were killed at a point where the railroad ran through inclosed fields which were used as cattle yards; that the cattle killed were part of a lot of thirty or forty cattle that were placed in the cattle yards the night before the killing; that the fences along the line of the road were broken down during the night and the cattle went upon the track and three of them were run over by a locomotive and killed. There was evidence touching the sufficiency of the fence and of the diligence and care shown by defendant's agents in driving the locomotive.

The following instructions were given at the instance of the plaintiff: " 1. If the jury believe from the evidence that the cattle mentioned in the petition were killed by defendant, their agent, agents or servants, by running over or striking them with their locomotive or train, and that where the cattle got upon the track the road runs through inclosed fields, and that defendant failed to erect and maintain, on the sides of the road through those inclosed fields, fences of the height and strength of a division fence and sufficient to prevent cattle and animals from getting on the railroad, and that it

was by reason of said failure that the cattle mentioned got upon the road, they will find for plaintiffs the value of the cattle so killed. 2. If the jury believe from the evidence that the cattle mentioned in petition were killed by defendant through carelessness, negligence or mismanagement of defendant, their agents or servants, they will find for the plaintiffs the value of the cattle killed or injured. 3. If the jury believe from the evidence that on the night prior to the occurrence plaintiffs' cattle were in a pasture and that the fences were then all up and gates shut, and that by some means unknown they got out and without the knowledge or consent of plaintiffs, and that whilst so out they wandered upon the track of defendant and were killed by the locomotive and train of defendant, through carelessness of the agents or servants of defendant, they will find for plaintiffs."

The defendant asked the court to give the following instructions: "1. If the jury believe from the evidence that the engineer in charge of the train at the time of the accident was at his place on the engine, and attentive to his duties there, and as soon as he saw the cattle used all means in his power to stop the train, and if the jury believe that the defendant had erected a legal fence on each side of their road, and that the cattle got on the road by breaking down said fence, then the defendant has been guilty of no negligence and the jury will find for the defendant. 2. If the jury believe from the evidence that the injury to the cattle was the result of accident alone, then the plaintiffs can not recover in this suit, and the jury will find for defendant. 3. If the jury find that after discovering the cattle on the track the engineer used all the means in his power to stop the train before coming to the cattle yards, and that he was running at the ordinary speed, then the company is not responsible for the cattle killed and the jury will find accordingly. 4. The law requires a fence, when built of posts and plank, to be four and a half feet high, and sufficiently close to turn small stock; and if the jury believe that the railroad company built such a fence, then they have complied with the law, and

the plaintiffs' cattle were unlawfully on the road. 5. If the jury believe that the fence built by the company would turn ordinary cattle, it is a sufficient fence in law, and the cattle were unlawfully on the track and were trespassers thereon, and in such case the plaintiffs being in fault first, they can not recover for killing them by the defendant's locomotive. 6. Gates and bars being for the exclusive benefit of the adjoining proprietor, such adjoining proprietor was bound to keep them closed, and this was not part of the duty of the company. 7. If the jury believe from the evidence that the fence erected by the defendant at the place of the accident, and which was there at the time of the accident, was a post and plank fence four and a half feet high, and sufficiently close, this was a legal fence. 8. The only direction of the law in regard to fences made of plank and posts is, that it should be four and a half feet high and sufficiently close." Of these instructions the court gave those numbered 1, 2, 5, 6 and 8, and refused those numbered 3, 4 and 7.

The jury found for plaintiffs.

*S. T. & A. D. Glover*, for appellant.

I. The first instruction given at the instance of plaintiffs was erroneous. It declares that the defendant is bound by law to erect and maintain fences on each side of the road where it runs through inclosed fields, and for failing to do so is liable for every accident that may result directly or remotely from the want of such fences. The common law does not require such fencing. (Towanda R. R. v. Murger, 5 Denio, 255; 4 Comst. 350; Clark v. Syracuse R. R. 11 Barb. 112; Railway Co. v. Skinner, 19 Penn. 303; 6 id. 472; Chicago & Miss. R. R. v. Patchin, 16 Ill. 198; Great Western R. R. Co. v. Thompson, 17 Ill. 131; 17 Ill. 541, 580; 2 Shelford on Railways, 679; 25 Verm. 122; Williams v. Michigan Central R. R. 2 Gibbs, 259.) Nor does the statute law. The legislature had no right to impose additional burdens upon the corporation. There is nothing to show that the company ever accepted the act of 1853.

II. The defendant's third instruction should have been given.

*J. R. Barrett*, for respondents.

I. Defendant by applying for and receiving from the county of St. Louis special taxes, amounting to $1,200,000, levied and raised by virtue of the act of February 24, 1853, accepted said act. But it was not necessary that the company should accept said act to be bound by it. (Thorpe v. The Rutland & Burlington R. R. Co. 1 Williams, Verm. 141.) By the common law of Missouri fences are not made to keep cattle *in*, but to keep them *out*. (4 Ohio, State, 424, 474.) The fences on the sides of the road were insufficient, and defendant was therefore liable. (39 Maine, 273 ; 1 Williams, 141.) Plaintiffs were in no fault. Defendant was therefore liable for any damage done through carelessness or negligence. (8 Barb. 390 ; 14 Barb. 364; 23 Verm. 387 ; 24 Verm. 487.) Even supposing the fence to have been in accordance with the requirements of the law, there was clearly gross negligence on the part of the engineer.

SCOTT, Judge, delivered the opinion of the court.

It has always been the understanding as to the law in this state that our statute concerning inclosures entirely abrogated that principle of the common law which exempted the proprietor of land from the obligation of fencing it, and imposed on the owner of animals the duty of confining them to his own premises. No conviction has more thoroughly occupied the public mind than this, and nothing would sooner arouse the attention of the community than an apprehension that the old rule of the common law was to any extent to be revived. As early as the 27th October, 1808, the act for regulating inclosures became a law, and from that time the people have rested in the belief that they incurred no responsibility and were not guilty of any fault or negligence towards others by turning loose their cattle, unless when their cattle trespassed upon fields inclosed in the manner pre-

scribed by law. An injury to cattle, unless trespassing on fields legally inclosed, was redressed without any inquiry whether the cattle, when they received the injury, were on the land of the owner or that of the individual committing the wrong; and this court here takes occasion to express its dissent to the applicability in this state of the doctrine and spirit of the case of the Railway Company v. Skinner, 19 Penn. 304, which concludes with the opinion " that an owner of cattle killed or injured on a railway has no recourse to the company or its servants; and that he is liable for damage done by them to the company or the passengers." Our cattle in their range allowed by law do better than the Pennsylvania cattle running at large, " which pick up a scanty subsistence on waste fields and lands." The range, as it is called, is a source of wealth to many of our citizens, and nothing would induce them more resolutely to oppose the location of a railroad in their vicinity than the knowledge that it would impose on them the obligation of keeping their cattle and stock in inclosures. That obligation would not be confined to those in the immediate neighborhood of the road, for cattle, when not confined, frequently stray much farther from their proprietor than would be supposed by those unacquainted with their habits. Many farmers have a sufficiency of uninclosed land for the pasturage of their cattle. Shall they be bound to inclose it at the peril of a suit for an injury caused by their cattle which may cost them their estates? The other interests in the state are not all to be made subservient to the railroad interest. That interest enters into competition with other pursuits with the advantages and privileges the law confers upon it, but there is nothing in it of so overshadowing a character that all other pursuits must yield to it. There are none who are not impressed with the importance of railroads, and their great utility as the medium of intercourse and commerce. No state that will keep pace with the age but must build and encourage them. But we should be cautious how we clothe them with privileges and immunities, at the cost of the rest of the community, which may

enkindle a spirit ·hostile to their existence and seeking its gratification in their destruction.

A railroad company is entitled to the free and uninterrupted enjoyment of the road which has been constructed for its use. No one can molest it in the enjoyment of this right, and he who by his wantonness or his negligence has received an injury by its machinery or otherwise has no just cause of complaint. But the steam engine, whilst it is very useful, is at the same time a very dangerous agent, and he who undertakes to use it must, in order to avoid doing injuries to others, employ a skill and diligence proportionate to its dangerous nature. The diligence necessary to avoid injuries in driving an ordinary wagon on the highway furnishes no idea of the care and circumspection exacted of those who use the steam engine. Although the duty of the company as a carrier extends only to the passengers and freight on the trains, and the law of carriers is only applicable to .it as the transporter of passengers and freight, yet as regards the persons and things to which it does not stand in that relation it is under that law which enjoins on it the duty of so using the things over which it has control as not to do harm to others, and which exacts of it a caution and prudence commensurate to the dangerous nature of the means which it employs. Whilst its first duty is the preservation of the passengers and freight, yet, consistent with that duty, in order to avoid injury, it is required to use the care and diligence of a prudent man, knowing that he is using a powerful and dangerous agent. As proprietor, the company is under no greater obligation to fence its road than any other owner of land. But, in the event of an injury, the fact that the road was not fenced must and should exercise an influence in weighing the degree of care to be employed by the company. When an injury is done, the omission to fence will be weighed along with the other circumstances in determining the measure of diligence to be used by the company or its agents. The want of the fence will increase the care required in order to prevent wrongs. In leaving the road unprotected the company is

aware that cattle may stray upon it, and its exertions must be increased in order to avoid injuries under such circumstances. The owner of cattle, as we have said, is under no obligation to inclose them. If he permits them to go at large and they should wander upon the road and be injured unavoidably, he can have no redress ; but if a loss occurs for the want of care and attention on the part of the company or its agents, it must be repaired by those who have caused it. It may be asked, why make the company increase its diligence for the want of a fence, and not hold the owner of cattle in the vicinity of a road guilty of negligence in not inclosing them ? The answer is obvious. The obligation of the company to increased care arises from the dangerous nature of the business it pursues. The care in conducting any business must be proportionate to its dangerous nature. This is a universal principle not applicable alone to railroad companies. Although railroad corporations are organized for the public benefit, are matters in which the state takes a deep interest and regards as of public concern ; although they may be looked upon as bodies endowed with capacities for the promotion of the public good and for the diffusion of advantages to the state, yet it must not be overlooked that such corporations are entirely managed by private individuals over whose selection the state has no control, and that their pecuniary profits belong exclusively to the companies and their stockholders. Here there is a motive to selfishness. In this respect they do not differ from any other private corporation whose sole aim is the making of money, and they should be subjected to the same control, for the safety and protection of the rights of individuals.

We are fully aware that the views herein expressed are seemingly in conflict with opinions declared in some of the states in relation to injuries done to animals by railroads. That difference arises in a great measure from the different views entertained in regard to the duty of the owner as to the confinement of his animals. Those courts which maintain that a railroad company is not liable for the destruction

Gorman v. Pacific Railroad.

of animals being on the road, conceive that the law imposes on the owner the duty of confining them; and if he permits them to wander abroad and they are killed by a company's steam engine, he can not recover damages for their loss, because he himself committed a fault and was guilty of negligence in not confining them. We conceive that the owner of animals is by our law under no obligation to fence them; that in not confining them he commits no fault, nor is he guilty of any negligence; that a railroad company, though not subject to an action in the nature of trespass *vi et armis* for an injury done by its servants with a steam engine unless by its command or with its assent, is yet liable to a suit in the nature of an action on the case for injuries done by its servants resulting from their negligence. (4 Wharton, 143.) Under section 51 of the act of 24th February, 1853, although the fences and cattle-guards thereby required are constructed, yet the companies are made liable for injuries to animals if negligently or willfully done. Although the owner of animals is not bound to fence them in, yet there may arise a state of circumstances showing that he was guilty of such willfulness or negligence in regard to his animals as would prevent a recovery of damages for their destruction. The cases of the C. H. & D. R. R. Co. v. Waterson & Kirk, 46 Ohio, State, 430; Kerwhacker v. The Cleveland, Columbus & Cincinnati R. R. Co. 3 Ohio, State; Darmer v. S. Carolina R. R. Co. 4 Rich. 334, furnish a support to most of the views we have above expressed.

Another question in this case is, whether the company under the 51st section of the general railroad act of the 24th February, 1853, was bound to fence the road when it passed over inclosed fields. The 56th section of the act subjects railway companies then existing and those thereafter to be created to the provisions of the 51st section. It is insisted that by the original charter of the company, as amended previously to the passage of the act of 24th February, 1853, there was no constitutional authority in the general assembly to alter its charter by imposing upon it the burden of fencing

the road, an obligation which was not imposed by the original law creating the company. The original charter was subject to the 7th section of the act concerning corporations. (R. C. 1845, p. ——,) by which the general assembly reserved to itself the right of suspending and repealing it. This power was yielded up by the act of March 1, 1851. (Sess. Acts, 1851, p. 270, sec. 4.) It was therefore maintained that, as the charter stood at the date of the act of February 24, 1853, there was no power in the legislature to compel the company to fence its road, as the exercise of such a power would violate that provision of the constitution of the United States which prohibits the passage of laws impairing the obligation of contracts.

It is settled that a private charter is a contract between the government and the company to which it is granted, and that as such it is secured by the constitution of the United States from violation by the state conferring it. But while private charters are thus protected it, is also true that corporations, like natural persons, are subject to those regulations which the state may prescribe for the good government of the community. There is no reason why corporations should not be subject to police regulations as well as natural persons. The injury resulting from the infraction of police laws by corporations may be as great if not greater than those caused by the violation of them by individuals. The motive of the law in requiring railroads to be fenced is not the security of cattle only, but chiefly the preservation of the persons and lives of passengers which would be greatly endangered if cattle were not restrained from wandering upon them. Where such dangerous and powerful agents as steam engines are brought into use, there should be a power in the legislature to prescribe such reasonable regulations as will prevent injuries resulting from their employment. The foresight of man is not competent to the task of prescribing in a charter all the regulations which time may show to be necessary for the security of the interests of the people of the state against injuries caused by the introduction of new, powerful and dangerous

agents for carrying on her intercourse and commerce. The charter must be taken subject to the understanding that in its operation affecting the interests of society it will be, like individuals, liable to be controlled by such reasonable enactments as may be dictated by a sense of what is required for the preservation of the persons, lives and property of the people, such enactments not contravening the expressed or plainly implied provisions of the charter. Our late statute giving relatives a right to recover damages when a person is killed is an instance of this police power over railroad corporations. This act has greatly increased the liability of companies. It has subjected them to actions to which they were not liable at the date of their charters. It has not fallen under our observation if the constitutionality of such laws has been questioned. In the case of Thorpe v. The Rutland Railroad Co. 1 Williams, Verm., 141, the constitutional power of the legislature to pass a law very similar to that under consideration underwent examination. The act imposing on the company the duty of maintaining fences on the lines of their road, and also to construct and maintain cattle-guards, was passed after the company had been incorporated. The court held that the legislature had the same control in regard to the business and profits of a corporation which it has to that of natural persons; that the legislature had the power to require existing railroad corporations to maintain cattle-guards at all crossings, or to respond in damages for all cattle injured by their trains through such omission; that this subject came clearly within the police of the state, the power to regulate which resides inalienably in the legislature; that the legislature may by general laws impose such obligations and restrictions upon railroads in regard to their business and for the security of the public interests as to materially affect their profits. The case of Suydam v. Moore, 8 Barb. 367, does not contravene the principles maintained in the foregoing one. The judge, in the opinion in the Vermont case, cites Suydam v. Moore as sustaining the doctrine therein expressed. To the same effect is the case of

Waldron v. The Renssalaer & Saratoga R. R. Co. 8 Barb. 390. In the case of Lyman v. The Boston & Worcester R. R. Co. 4 Cush. 288, it was held that a statute making the proprietors of railroads responsible for injuries by fire communicated from their locomotive engines applied to railroads established before as well as since its passage, extends as well to estates, a part of which was conveyed by the owner, as to those of which a part is taken by authority of law for the purposes of a railroad. So, in the case of Norris v. The Androscoggin R. R. Co. 39 Maine, 273, where railroad corporations, required by their charter to keep and maintain legal and sufficient fences on the exterior lines of their roads, for neglecting that duty, were made liable to a forfeiture of one hundred dollars per month by a subsequent act; it was held, that the act, being remedial and for the protection of property peculiarly exposed by the introduction of locomotive engines, applied to corporations existing before its passage.

The 51st section of the act of the 24th of February, 1853, requires railroad corporations to erect and maintain fences on the sides of their roads where the same passes through inclosed fields, and also to construct cattle-guards at all road crossings, and enacts that until such fences and cattle-guards shall be duly made, the corporation and its agents shall be liable for all damages which shall be done by their agents or engines to cattle, horses, or other animals thereon. In actions to recover damages for injuries suffered by the omission to comply with this enactment, it is clear that the question of negligence or of care and diligence can not arise. The liability to damages is imposed for not erecting the fence or cattle-guards; and howsoever great a degree of care may have been employed by the agents of the company, it will be no defence, as the right to recover is made to depend only on the fact of an injury being done and the omission to build and maintain suitable fences and cattle-guards. (Suydam v. Moore, 8 Barb. 308.)

It is singular that the plaintiffs did not introduce at the trial and put upon the record the evidence of the acceptance

by the Pacific R. R. Company of the provisions of the act of February 24, 1853, and thereby have relieved the court of the labor of a portion of this investigation. We can only look at the facts in the record, unless they are of that class of which we are required to take judicial notice. We can not take judicial cognizance that the Pacific R. R. Company has accepted the provisions of the act of 1853, although we may personally know that the company never omits to avail itself of it when it is favorable to its interests, even to the taking a million and upwards under it, and then not hesitate to require proof of its acceptance of it. This matter would not be noticed but for the frequency with which the question of the acceptance of that act by the railroad companies has been raised, and the seeming belief on the part of litigants with those companies that the courts will take judicial notice of their acceptance of the provisions of that act.

According to the views expressed in the foregoing opinion there was no error in the court below in the giving or refusing of instructions.

The judgment is affirmed, Judge Napton concurring; Judge Richardson not sitting.