JOSEPH CLARK'S ADM'X, Respondent, *v.* HANNIBAL AND ST. JOSEPH RAILROAD COMPANY, Appellant.

1. *Practice—Joinder of Causes of Action.*—Several causes of action for injuries to person or property, whether real or personal, direct or consequential, and whether the damages are given by statute or by common law, single or double, may be included in the same petition.

2. *Practice—Misjoinder of Causes of Action.*—Where several causes of action are joined in one count of a petition, the count will be bad on demurrer, or on motion in arrest of judgment.

3. *Practice—Verdict.*—Where a verdict is found for an entire amount of damages upon a petition containing several counts, if any of the counts be defective the judgment will be arrested.

4. *Practice—Instructions.*—At the close of the plaintiff's evidence, the defendant has a right to ask of the court instructions upon the case as made by the plaintiff, and to have the case submitted to the jury.

5. *Practice—Administration.*—Where an action has been commenced for damages done to real estate, if the plaintiff die pending the suit, it may be revived and conducted by the administrator.

6. *Master and Servant—Contractor.*—A railroad company is not liable for the injuries occasioned by the trespass or negligence of the servants and laborers employed by the contractor engaged in building the road. The principle of *respondeat superior* applies to the contractor who employs the men, but not to the corporation with which the original contract is made. There can be but one responsible master for the same servants, and when that relation ceases the liability ceases also.

7. *Railroads—Trespasses—Enclosures.*—Railroad corporations are not required to fence in their tracks so as to prevent cattle from straying upon the adjoining fields. If they fail to fence their tracks and put up proper cattleguards, they become liable to the owners of such stock as may be injured

while straying upon the track, without any proof of negligence. (R. C. 1855, p. 437, § 52, and p. 647, § 5.)　The object of the statute was the protection of the railroad, the safety of passengers and trains, and the prevention of accidents and injuries to cattle or other animals straying on the track.

8. *Railroads—Trespasses—Damages.*—Where a railroad corporation has had the right of way condemned and the damages assessed under the statute, they have power to construct their road through the land thus condemned, and to do all things that may be necessary and proper for that purpose; and, to the extent of the powers and rights thus acquired, neither the corporation nor the contractors can be held liable as trespassers or wrongdoers.

9. *Railroads—Trespasses—Nuisance.*—In the absence of any negligence, unskilfulness or mismanagement in the construction of an embankment for the bed of a railroad over land through which there was no natural channel for the passage of water, the injury done by such embankment in causing the water to overflow the land of the adjoining proprietors must be considered as the natural consequence of what the corporation had acquired the lawful right to do by a condemnation of the land and the assessment of damages therefor, and such damages must be taken to have been included in the compensation assessed.

## *Appeal from Livingston Circuit Court.*

The facts of the case are stated in the opinion.

After the evidence for plaintiff and defendant was closed, the court was asked to charge the jury as follows:

The plaintiff moved the court to declare the law to be—

1. That if, in the construction of said road, the laborers, agents or employees of said railroad, in the employment of defendant in 1857, threw down the fence around plaintiff's field of corn, at a point more than fifty feet from the centre of said railroad track, and left the same down, and that, by reason thereof, cattle, hogs, &c., entered into said field of corn and damaged or destroyed the same, the jury will find for the plaintiff the value of the corn so destroyed, or the value of the damage so done.

2. That if defendant, its agents, or employees, neglected to erect and maintain fences on the sides of said road, where the same passes through said enclosed field of plaintiff, of the height and strength of a division fence required by law, with openings or gates or bars therein, and farm-crossings

of the road, for the use of said proprietor of the adjoining land, and that, in consequence thereof, cattle, hogs and stock got into said field and destroyed or damaged said crop of corn or said crop of wheat, that the jury will find for the plaintiff the value of the corn or wheat so destroyed, or the value of the damages so done.

3. That if laborers, agents, or servants, in the employ of defendant, while grading said road, negligently threw up embankments of earth on the west side of said farm of plaintiff, thereby damming up the water and causing the same to change its channel and overflow a part of said field outside of defendant's right of way, and thereby rendered the same unfit for cultivation, the jury may assess the damage thereby sustained.

4. That if the laborers, agents, or servants, in the employ of defendant, while laying the track of said road, threw down the fence around plaintiff's field of wheat in 1859, at a point more than fifty feet from the centre of said railroad track, and left the same down, and neglected to erect and maintain a fence on each side of said road in said enclosure, and that by reason thereof the said field of wheat was left unprotected from entry by cattle, hogs and stock, and that plaintiff's crop of wheat was thereby destroyed or damaged, the jury will find for plaintiff the value of the wheat crop so destroyed, or the value of the damage so done.

5. That if, in grading said road, the agents, laborers, or servants, in the employ of defendant, threw up heaps of earth on said farm, outside of defendant's right of way, and thereby injured the same, or deposited heaps of dirt in a private road of plaintiff's, outside of their right of way, leading from his residence to the public highway, and thereby obstructed the same, the jury may assess the damage so sustained thereby.

6. That if defendant, by his agents, servants, or employees, caused a locomotive with cars attached to run over and kill plaintiff's calves, or cow, or sow, the jury may find for plaintiff the value of such stock so killed, provided the same was

done on a part of the road not enclosed, and not at a crossing of a public highway.

7. That if the jury believe from the evidence that the work performed on the Hannibal and St. Joseph Railroad was executed under the direction and constant supervision of the Hannibal and St. Joseph Railroad Company, their officers or engineers, and that said railroad company had the power through its officers or engineers to control and direct the laborers and employees on the road in conducting their work, they will find for the plaintiff to the amount of damage sustained by him from the acts, negligence or omissions of said laborers, whether the laborers were employed by John Duff & Co., Shea & Griffin, or other sub-contractors, instead of the Hannibal and St. Joseph Railroad Company.

8. That if the jury find for the plaintiff in any sum, they may in their discretion allow interest on the amount so found by them as damages.

The court further instructed the jury :

1. It is admitted by the defendant, that in the years 1857 and 1859 the defendants, its agents, or employees, failed to erect and maintain fences on the sides of their railroad, where the same passes through said enclosed field of plaintiff, of the height and strength of a division fence required by law, with openings or gates or bars therein, and farm-crossings of the road, for the use of the proprietors of the adjoining land.

2. It is also admitted by the defendant, that the defendant by his agents, servants, or employees, caused a locomotive with cars attached to run over and kill plaintiff's calves, cow and sow, and that the same was done on a part of the road not enclosed, and not at a crossing of the public highway, and that their value was forty-five dollars, and also admits that they were killed in plaintiff's field.

The court farther instructed the jury, that, for the purpose of trial, defendant admitted that Joseph Clark, deceased, owned the land mentioned in plaintiff's petition.

Defendant admitted that the stock mentioned in plaintiff's petition was killed on that part of the railroad in plaintiff's field, and that the railroad running through said field was not fenced on either side in said field.

Defendant admits that Catharine Clark is administratrix of Joseph Clark, deceased.

To the giving of which instructions the defendant at the time excepted.

The defendant then asked the court to give the following instructions to the jury:

1. If the jury believe from the evidence that the laborers under Patrick Cochran threw down and left down the fence, described in the first count in said petition, while grading the defendant's road through said field, whereby the hogs and other animals got into said field and destroyed and injured the corn therein, they will find for the defendant on said count, unless they further believe from the evidence that the defendant, or some of its officers or agents authorized so to do, directed said laborers to throw down or leave down said fence.

2. If the jury believe from the evidence that defendant's railroad was located and constructed through the land of plaintiff's intestate, described in the petition, and that the damages resulting from said location and construction to said intestate were assessed at six hundred dollars by three discreet, disinterested citizens of Livingston county, and a judgment rendered thereon by the clerk of this court and said judgment paid by the defendant, and that the field described in the second count in said petition was overflowed and the water dammed up by reason of the embankment described in said petition, the said assessment and judgment thereon embraced all the damages resulting from the location and construction of said road through said land, and the plaintiff cannot recover any damages for the damming and overflowing of said land by reason of the embankment, as alleged in the second count of plaintiff's petition, and they will find for the defendant on said count.

3. If the jury believe from the evidence that the teamsters and persons hauling bridge timber for Grand river bridge drove out on the wheat growing in the field described in the count in said petition, and thereby injured said wheat, they will find for the defendant on said count, unless they further find that the defendant, or its officers or agents authorized so to do, directed said teamsters and persons so hauling said bridge timbers so to do.

4. If the jury believe from the evidence that defendant's railroad was located and constructed through the land of plaintiff's intestate described in the petition, and that the damages resulting from such location and construction to said intestate were assessed at six hundred dollars, and judgment rendered therefor by the clerk of this court and paid by the defendant, and that the private way described in the fourth count in said petition was obstructed by the laborers working on defendant's railroad depositing earth excavated from said railroad on said private way, then the damages resulting from the depositing of said earth in said private way were included in said assessment and payment of damages, and the plaintiff cannot recover anything therefor, and the jury will find for the defendant on said count.

5. If the jury believe from the evidence that plaintiff's intestate was paid $600 damages for the right of way through his land, the duty of erecting a fence on each side of defendant's railroad, where it passes through the enclosed field described in the petition, was thereby devolved on the said intestate; and if he neglected to erect such fence, and cattle and hogs got into said field for want of such fence, the jury will find for the defendant as to all damages done for want of such fence.

6. The jury are instructed, in this case, that the defendant is a common carrier of passengers and property, and as such it is bound to carry with speed and safety all passengers and property, offered to it, to their destination along its railroad, unless it has reasonable excuse for not doing so; and that the paramount duty of its agents and employees, in running

a train over said road, is to look first to the safety of the persons and property upon the trains.

7. And if the jury in this case believe from the evidence that the stock sued for was struck and killed or injured by the defendant's locomotive or cars, and that the engineer in charge of the locomotive, with due and proper regard to the paramount obligation which the defendant was under, could not have prevented the locomotive from striking any of said stock, they will find for the defendant.

8. If the jury believe from the evidence that the stock sued for in this case was killed or injured in an enclosed field belonging to plaintiff's intestate, and that the defendant's road was located and passed through said field at the time said stock was killed or injured ; and if the jury further believe from the evidence that three discreet, disinterested men, citizens of Livingston county, were appointed by the circuit judge of said county to examine and view the land belonging to plaintiff's intestate through which the defendant's railroad was located, and said viewers assessed the damages resulting to plaintiff's intestate from the location and construction thereof at the sum of six hundred dollars, and that a judgment was entered for the same on the records of this court and no objections were made thereto by plaintiff's intestate, the duty of erecting and maintaining a good and sufficient fence along each side of said railroad through said field thereby devolved upon plaintiff's intestate ; and if he neglected to erect and maintain such fence, and the stock sued for entered upon defendant's railroad for want of the same, and were killed or crippled while therein, they will find for the defendant.

The court refused all of defendant's instructions except the third.

*Carr*, for appellant.

I. The respondent, as administratrix of Joseph Clark, deceased, is not the proper party to maintain the suit for the injuries alleged in the second and fourth counts, viz: for

building the embankment in said intestate's field, whereby the water was caused to overflow said field, and for depositing the heaps of earth in said intestate's private way across his land. The reason is, that said acts are injuries to the inheritance, and the heir is the proper party to prosecute the suit for such injury ; being an injury done to the realty, the administratrix cannot maintain a suit for it.

II. The causes of action stated in the first, third and fifth counts are improperly united in the same suit with the causes of action stated in the second and fourth counts. The reason is, that the first, third and fifth counts are for damages to the personalty, and the second and fourth counts are for damages due to the realty. This is a misjoinder of actions ; they do not all belong to the same class. (R. C. 1855, p. 1228, art. 6, § 2.) Besides, the first and third counts are actions of trespass for double damages on the statute to prevent "Trespasses," and the other counts are either actions on the case or trespass. This is an improper uniting of actions in the same petition. (Lamport v. Abbott, 12 How. 340 ; Alger v. Scovill, 6 How. 131; 1 Whit. Pr. 672; Cooper v. Bissell, 16 Johns. 146 ; Hall v. Fisher, 20 Barb. 441 ; Williams v. Hingham, &c., 4 Pick. 341 ; Frazer v. Roberts, 32 Mo. 457 ; Highland Turnpike Co. v. McKean, 11 Johns. 109 ; Duchess Manuf'g Co., 14 Johns. 238 ; 9 Cow. 151.)

III. The court below improperly refused to instruct the jury to find for the appellant on the first four counts in the petition, at the close of the respondent's evidence, for the reason that the respondent had not adduced sufficient evidence to support said counts. An instruction of this kind admits all the facts to be true, and still the evidence is not sufficient to support the petition. The plaintiff makes out no cause of action ; it is in the nature of a demurrer to the evidence. If the plaintiff has failed to adduce sufficient evidence to sustain the allegations in his petition, and the defendant is of that opinion, he has a right to take the opinion of the court in the matter ; and if the court is of the same opinion, it is its duty so to instruct the jury, and that

ends the case. This practice will save the time of the court, the parties, and the witnesses in behalf of the defendant from being examined when there is really no occasion for examining the defendant's witnesses; besides, it will save considerable cost. (Harris v. Woody, 9 Mo. 112; Lee et al. v. David, 11 Mo. 114; Rucker v. Eelings, 7 Mo. 115; Font v. Sabin, 19 Johns. 154; Pratt v. Hull, 13 Johns. 334; Naugatuck R.R. Co. v. Waterbury Button Co., 24 Conn. 468; 25 N. York, 208; 2 Whittaker's Pr., 2d edition, 338 et seq.)

IV. The instructions given to the jury at the close of all the evidence do not properly lay down the law. They enunciate the proposition, that if the fifteen or twenty Irishmen, under Patrick Cochran, whilst grading that part of appellant's road which runs through respondent's intestate's field, threw down or left down the fences, whereby stock got into said field and damaged the corn therein, then the appellant is responsible for all the damage thus done, simply because said Irishmen were working for the benefit of the appellant at the time, and had an engineer on the road at the time whose duty it was to watch the work and see that it was done in conformity with the contract between John Duff & Co. and the appellant, although said engineer had no supervision or control over said Irishmen farther than that he might have them discharged if they did not do their work according to contract. This is not law; the relation of master and servant is the true test of liability. The laborers themselves and their employer, Patrick Cochran, alone are responsible for such damage. (Barry v. City of St. Louis, 17 Mo. 121; Blake v. Ferris et al., 1 Selden, 48; Peck v. Mayor of N. York, 4 Seld. 422; Kelly v. Mayor of N. Y., 1 Kernan, 432; Lockwood v. Mayor of N. Y., 2 Hilton, 66; Chicago City v. Robbins, 3 Black. 418.)

*Ray & Woolfolk*, for respondent.

The court committed no error. (30 Mo. 374; Am. Railw. Cas., 290; 3 Hill, 531; 2 Denio, 433; Sto. Ag., pp. 452 &

454; Dunlap's Pal. Ag., 296; 23 Pick. 24 & 31; 14 Ills. 85; 30 Mo. 372; Sedg. on Dam., 405–6.)

As to the necessity of erecting and maintaining fences on each side of the road, see R. C. 1855, § 52, p. 437. As to width of road, or right of way, see R. C. 1855, p. 425, § 29, s. d. 4. Sec. 57 of the "Act to authorize the formation of railroad companies" (R. C. 1855, p. 438) applies the provisions of that act to all "existing" corporations, as well as to those to be afterwards created.

If appellant, its officers, or agents, had a general control over the work done, and could have prevented the laborers under Cochran from throwing and leaving down fences around intestate's field and neglected to do so, they are as much responsible for such neglect as if they had ordered said fence to be left down. The first instruction, therefore, of appellant was not the law.

The appellant was not authorized by its charter to inflict unnecessary damage upon the owners of adjoining land; only the necessary and unavoidable damage resulting from the construction of the railroad were estimated by the viewers. (§§ 7, 8 & 9 of the "Act to incorporate the Louisiana and Columbia R.R.," Jan. 27, 1837, and the "Act to amend an act entitled 'An act to incorporate the Han. & St. Jo. R.R. Co.,'" Feb. 23, 1853, § 5.) As to the powers of railroad companies, see R. C. 1855, p. 435, § 29.

Section 2d of "An act to amend an act entitled 'An act to incorporate the Hannibal & St. Jo. R.R. Co.,'" Mar. 3, 1855, gives the company power to cross a private road, but no power to render it unfit for travel by deposits of mud. The railroad company is expressly required to have a bridge erected for crossing the same in all such cases. This provision was in existence at the time damages were assessed, and it is not to be presumed that respondent's intestate was compensated by the viewers for damage to his private way, when, if the law, then in force, had been regarded, no damage would have resulted.

The duty to erect fences on the sides of its road, where

the same passes through enclosed fields, was imposed by the laws of the State. (R. C. 1855, p. 437, § 52 & 57.) This law was in existence at the time damages were assessed by the viewers, and it is not to be presumed that they estimated the labor of maintaining fences on the sides of the road in their damages, as the railroad company was required to erect and maintain the fences. This law was not inconsistent or conflicting with the charter of the railroad company. (R. C. 1845, p. 432, § 7 ; Ang. & Ames on Corp., § 767.)

The cases cited by appellant on the question of damages having been assessed by viewers, are inapplicable, from the fact that in those cases the laws requiring the railroad to maintain fences on the sides of its road were subsequent to the assessment of damages, and naturally this duty was presumed to have been embraced in the assessment of damages. In this case the assessment was made under the law then in force, and therefore not embraced in the assessment of damages.

HOLMES, Judge, delivered the opinion of the court.

This action was brought to the May term, 1860, of the Circuit Court of Livingston county, for the recovery of damages done to the plaintiff's property in process of the construction of the Hannibal and St. Joseph railroad through the plaintiff's enclosed farm, and for killing cattle in the years 1857 to 1860. The amended petition on which the case was tried contained five counts: the first, for damages occasioned in 1857 by the laborers on the road throwing down the fences to a greater width than the strip of land condemned for the use of the railroad, without, at the same time, fencing the railroad land on either side, whereby cattle and hogs entered into the plaintiff's fields and destrowed his growing corn, and double damages were claimed under the act of Nov. 17, 1855, concerning Trespasses ; the second, for damages from the accumulation and flowage of water on a small part of the farm, caused by the raised embankment of the road-bed on the western side of the farm, in 1859 ; the third, for dama-

ges done, in the spring of 1859, to a field of growing wheat, under like circumstances as in the first count, for which double damages were claimed under the "Act concerning trespasses"; the fourth, for damages occasioned in 1857 by the workmen on the road in depositing excavated earth across the plaintiff's private way on a part of the farm lying beyond the line of the land condemned for the use of the railroad; and the fifth count was for damages in killing cattle on three different occasions—that is to say, two calves of the value of $8, in October, 1859; one Durham cow of the value of $25, and one sow of the value of $12, in the month of March, 1860—by running over them with the locomotives, while straying upon the track.

The answer to the first count denied that the trespasses therein mentioned were committed by the agents, employees or servants of the corporation; it set up as a defence to the second count, that the company had the power to construct their road, and the right of way, by their charter, and that the land taken for the use of the railroad had been duly condemned, taking into consideration the advantages and disadvantages to the land of the plaintiff, and that the compensation assessed had been paid to him; it denied the material allegations of the third and fourth counts, and to the fifth, it pleaded the right of way so acquired, and that it was the duty of the plaintiff to fence his own land, the cost thereof having been included in the compensation made; and further, that the animals were killed without any negligence, unskilfulness or misconduct on the part of the defendant.

On the trial of the cause in November, 1864, it appeared in evidence that the laborers and workmen engaged in constructing that part of the road, and by whom the several trespasses complained of in the first four counts were committed, were employed by one Patrick Cochran, a sub-contractor under Shea, Griffin & Paris, who were sub-contractors under John Duff & Co., who were the principal contractors with the corporation for the construction of the whole road from Hannibal to St. Joseph; that Cochran employed

under him some fifteen to twenty-five hands, who were selected, superintended, controlled, directed and paid by him-self; and that the corporation employed an engineer on that division of the road, who had a general superintendence over the construction of the road, and whose duty it was to see that the work was done according to contract. It further appeared that the several acts of trespass and the injuries complained of were committed by the employees and servants of Cochran, the sub-contractor, and under his immediate direction and control, and not by any express direction of any officer, agent, employee or servant of the company otherwise; that the fences of the plaintiff were taken down to a greater extent than the width of the railroad land, and that no fences had been erected by the company on either side of their road through this farm; that the plaintiff's fences were poor in other parts, and that cattle and hogs got into the fields by the openings for the railroad, and also sometimes broke through the fences in other places. And it appeared that, by reason of the raised embankment of the road-bed and the natural configuration of the ground, water accumulated against the same on the southern side, overflowing an acre or two of the plaintiff's land, and rendering it marshy and unfit for cultivation, notwithstanding the engineer had, at the instance of the plaintiff, caused a pipe to be run through, underneath the embankment, for the purpose of draining off the water. There was much other evidence, on either side, · relating to the details of the transactions and the extent of the damage sustained, and some admissions of facts not disputed, which it will be unnecessary to notice here.

Some thirteen instructions were given for the plaintiff, and ten refused for the defendant, and the jury rendered a general verdict for entire damages, the sum of $1,564 for the plaintiff. There was a motion for a new trial and a motion in arrest of judgment, and the case comes up by appeal.

It was objected by the defendant that there was a misjoinder of the several causes of action stated in the petition, for the reason that they did not all belong to one and the same

class. The third clause of section 2, Article VI. of the act concerning Practice (R. C. 1855, p. 1228), provides that " several causes of action founded on injuries with or without force to person and property" may be joined in the same petition. This class would seem to include all injuries whatever to person or property, whether real or personal, direct or consequential, and whether the damages are given by statute or by common law, single or double; and it will certainly include all actions of trespass or case under the old practice. We are of opinion that the petition was not objectionable for misjoinder of counts; but we would not be understood as deciding that this was a proper case for damages under the "Act concerning trespasses." But the fifth count contains three distinct causes of action combined in one count, being for so many distinct and several trespasses or injuries on different occasions and at times far apart. This count is for this reason clearly bad on demurrer, or on motion in arrest. It has been decided by this court in several cases, that distinct causes of action cannot be combined in one and the same count. (McCoy v. Yager, 34 Mo. 134.) Moreover, the damages claimed on two of these occasions are less than twenty dollars and below the concurrent jurisdiction of the Circuit Court in such cases. (R. C. 1855, p. 533, § 8.)

Again, the verdict is entire for one total amount of damages, without any separate finding of the issues on the several counts. On this verdict, it is impossible for the court to know how the issues were found, or on which of the counts the damages were assessed, or how much on each one. Such a verdict is clearly erroneous. There should have been a separate finding and a distinct assessment of the damages on each count. This is assigned as one of the grounds for the motion in arrest, and for this reason alone it should have been sustained. (Talbot v. Jones, 5 Mo. 217; Mooney v. Kennett, 19 Mo. 551; Fenwick v. Logan, 1 Mo. 401; Hickman v. Boyd, 1 Mo. 495; 21 Mo. 149.)

It appears that, at the close of the plaintiff's case, the de-

fendant moved the court to non-suit the plaintiff on the first four counts of the petition, because they were not sustained by the evidence offered, and his motion was overruled. In this there was no error. The court cannot compel the plaintiff to submit to a non-suit. If the plaintiff refuse to suffer a non-suit and insists upon submitting his case to the jury, the court will enforce its opinion by awarding a new trial, if the jury should disregard the law or the instructions of the court, and find a verdict for the plaintiff. (Wells v. Gaty, 8 Mo. 681; Perrin v. Wilson, 9 Mo. 147; Wells v. Biddle, 9 Mo. 158; Clark v. St. Boat "Mound City," 9 Mo. 145.)

Defendant then asked the court to instruct the jury on each of said four counts to the effect that the plaintiff had not adduced sufficient evidence to support them, and that the jury should find for the defendant on those counts. These instructions were refused by the court for the reason (as stated in the bill of exceptions) that the defendant was not ready to close his case and submit the cause to the jury. We do not purpose, in this case, to examine into the evidence for the purpose of determining whether or not these instructions should have been given. The court below may have been justified in refusing them on the ground that there was some evidence, however slight, which was competent to go to the jury; on this we do not undertake to decide. But the reason assigned for the refusal, in the bill of exceptions, can hardly be considered sufficient. We suppose it may have been founded upon the 47th section of Article X. of the Practice Act (R. C. 1855, p. 1268), which provides that " where the evidence is concluded, and before the case is argued or submitted to the jury, either party may move the court to give instructions on any point of law arising in the cause." It is evident that the object of this section was to authorize the giving of written instructions, and to require the court to give them, at the instance of either party, at the conclusion of the evidence or before submitting the cause to the jury, rather than to fix the exact order of practice; and

when the plaintiff has concluded his evidence, it may very well be said that the evidence is concluded for all the purposes of such instructions as these. We do not see any propriety in requiring the defendant to proceed with his defence, before the court should be called upon to pass on them, nor do we think that such was the reason or intent of the statute. The court should have given or refused the instructions, when so required, at the conclusion of the plaintiff's case. It is the common practice and well sustained by authority, ancient and modern, and by several decisions of this court, when the plaintiff has offered no evidence which would be sufficient in law, if true, to warrant the jury in finding a verdict in his favor, to instruct the jury to find for the defendant; in such case there is nothing else for the jury to do. (Harris v. Woody, 9 Mo. 112; Lee v. David, 11 Mo. 114.)

Another point made by the defendant is, that a part of the damages sued for was for injuries done to the realty, and that the heir only, and not the administratrix, can maintain a suit for such damages. There is obviously nothing in this objection. The whole cause of action had accrued before the death of Joseph Clark, and upon his death being suggested, his administratrix and legal representative was properly substituted as plaintiff in the suit, under the statute relating to abatement of suits, by force of which the cause of action survives.

As the case will have to be remanded for another trial, it will not be worth while for us to review the instructions in detail; but it will be proper to indicate our opinion on the main questions involved in them for the guidance of the parties and the court below. Several of the instructions given for the plaintiff proceed upon the idea that the defendant is liable for the trespasses and injuries committed by the laborers and workmen employed in the construction of the road by the sub-contractor Patrick Cochran, while under his exclusive direction and control as his employees and servants. In this respect we think they were erroneous. This

position appears to be well sustained by all the later and better authorities. In the case of Lowell v. Bost. & Low. R.R. Co. (23 Pick. 24), a contrary doctrine seems to have been held, and the case of Bush v. Steinman (1 Bos. & P. 404), cited as authority; but these cases, so far as they can be considered as bearing upon a case like this, have been overruled by numerous later decisions, both in this country and in England. In the case of Barry v. City of St. Louis (17 Mo. 121), the authorities were reviewed at large, and it was held that the City was not liable for injuries occasioned by the negligence of workmen employed by a contractor on the Biddle-street sewer, and that the relation of master and servant in such cases did not extend beyond the contractor. The liability depends on this relation, and the principle of *respondeat superior* applies to the contractor who employs the men and whose servants they are, but not to the corporation with which the original contract is made. In this case it clearly appeared that the laborers, by whom it was proved that the trespasses and injuries were committed, were the employees and servants of Patrick Cochran, the sub-contractor, and it makes no difference that there was an engineer of the company on that division of the road, whose duty it was merely to superintend the general progress of the work of construction, and to see that it was done according to the contract made by the corporation with the principal contractors. He had no immediate control over the men employed by the sub-contractor; the corporation itself had none. The principle of *respondeat superior*, in such case, applies to the sub-contractor only; as between him and the laborers, his employees, the relation of master and servant exists and it ceases with him. There cannot be but one responsible master for the same servant, and where that relation ceases, the liability ends also. (Blake v. Ferris, 1 Seld. 48.)

Other instructions given for the plaintiff assumed as their basis, that the defendant was liable for the damages done to the growing crops by cattle and hogs getting into the fields

through the openings in the fences of the plaintiff which had been made by the workmen on the road, in the progress of their work, on the ground that the statutes make it the duty of the railroad companies to fence in their railroads where they run through enclosed fields. These instructions also proceeded upon a mistaken view of the law of this subject. The statute concerning Railroad Associations (R. C. 1855, § 52) requires railroad corporations to erect and maintain fences on the sides of their roads, and cattle-guards also, where they pass through enclosed fields, " suitable and sufficient to prevent cattle and animals from getting on the railroad," and provides that until such fences and cattle-guards are made, the corporation shall be liable, without proof of negligence, for all damages done by their agents or engines to animals thereon ; but that, after such fences and guards are made, they shall not be liable for any such damages unless " negligently or wilfully done." This section was so amended in 1864, as to authorize the owner of enclosed fields to build such fences at the expense of the railroad company, but without changing the object or principle of the act. It was held in Gorman v. Pacific Railroad ( 26 Mo. 441), that this section applied to that company as not being inconsistent with their previous charter ; nor do we find anything in the charter of this defendant which would bring it within the exception of the 57th section of the act concerning Railroad Associations. The act concerning " Damages" also, (R. C. 1855, p. 647, § 5,) proceeding on the same principle, provides, in like manner, that when animals are killed by cars or engines on any railroad, the owner may recover the value in damages, without any proof of negligence, unskilfulness or misconduct, unless the accident occurred on a portion of the road enclosed by a lawful fence, or in the crossing of a public highway. But all these acts have for their object and scope the protection of the railroad, the safety of passengers and trains, and the prevention of accidents and injuries to cattle or other animals straying upon the track. They require the company to fence the railroad in and to fence the

animals out; they do not require the company to enclose the farms or fields of private land-owners for their benefit, nor for any other purpose. Nor do they impose on the company any absolute obligation even to fence the railroad in; their effect is only to make the corporation liable to the owners of cattle or other animals for injuries done to them when straying upon the track, without any proof of negligence, in case they fail to erect such fences. The instructions in question seem to be framed upon the assumption that the railroad company was bound by these statutes to fence in the farms and fields of the private land-owners against the cattle and animals of other proprietors, their neighbors—at least, so far as that would be accomplished by erecting fences along the railroad—and that, unless that were done, the company would be liable for all the damages which the plaintiff's growing crops might suffer by reason of the cattle and hogs of other persons getting into his fields. But, plainly, it belongs to the land-owner himself to fence his own farm, and enclose his own fields, at his own expense, against all intrusion from without.

At common law, it was the duty of every land-owner to keep his cattle within his own enclosures, and the liability of one owner to another for damages done by straying cattle, turned much upon this principle; but this rule has been considerably modified by operation of the statutes of this State. Aside from the statute, the railroad company would not be bound to fence their road against stray cattle, nor would they be liable for killing such cattle upon their tracks without proof of negligence on their part; on the contrary, the owners of cattle might be liable for damages done to the railroad, or to trains and passengers, by reason of such cattle being negligently allowed to stray upon the railroad. The statutes so far change all this as to relieve the owners from the obligation to keep their cattle within enclosures, and to make the railroad corporation liable for killing cattle upon the track, without proof of negligence on their part, unless they fence in the railroad where it runs through en-

closed fields; but they go no further. In Spanish times here in Missouri, the custom sometimes was to enclose the cattle within the towns and commons, and to fence the cultivated fields out; but the habit has been in modern times to enclose the fields, fencing the cattle out, with free range upon the prairie or the highway. And this state of things seems to have been recognized, if not established, by the act concerning "Inclosures," (R. C. 1855, p. 844,) which requires all fields and enclosures to be enclosed by the owners with a prescribed lawful fence against the cattle and animals of whatever other proprietor; and it has been held that the owners of cattle in this State were not bound by law to keep their cattle within enclosures. In this view of the subject, it is apparent that the principal motive of these railroad acts is the security of such cattle as well as the protection of the railroad, and the safety of the persons and lives of passengers. (Gorman v. Pacific Railroad, 26 Mo. 441.) But it cannot be inferred that the railroad company is bound to build fences for the enclosure of the farms and fields of private land-owners, nor that it incurs any liability to such owners by reason of any failure to erect and maintain the fences required by these railroad acts, otherwise than by killing cattle on the track.

Another question presented by the instructions was, to what extent the condemnation of the land for the use of the railroad, and the compensation paid for it, taking into consideration the advantages and disadvantages to the landowner, covered and compensated the damage and injury done to the proprietor in consequence of the condemnation, and the construction of the railroad through his land, and how far the rights thus conferred upon the corporation extend. We need not undertake to answer these questions here further than a proper understanding of the law of this case may require. There was no question but that the corporation had thus acquired the right of way, under their charter and the laws of the State, nor that they had power to construct their road through this land, and to do all things that

might be necessary and proper for that purpose. And it is clear that to the extent of the powers and rights acquired by the corporation under the laws, and within their proper scope, neither the corporation nor the contractors, nor the workmen under them, can be regarded trespassers or wrongdoers. (1 Amer. Railw. Cas. 206; Aldrich v. Cheshire R.R. Co., 1 Fos., N. H., 359.) They had the lawful power and the right to construct the railroad through the plaintiff's farm, and to pull down the plaintiff's fences for that purpose, and to raise embankments to the necessary grade for the road-bed. Whatever damage resulted to the plaintiff from these acts, and all disadvantages thereby occasioned to his property, must be considered as included in the compensation awarded and paid; and any inconvenience, or diminution of value, or other injury to the plaintiff's property beyond this, must now be treated as *damnum absque injuria.* (Parker v. Bost. & M. R.R. Co., 3 Cush. 107; 1 Amer. Railw. Cas. 547.)

Now so far as the construction of the railroad through the plaintiff's land imposed upon him the necessity of changing fences, or of building new and additional fences, in order to enclose his fields against the intrusion of cattle and animals belonging to other persons, he was bound to make those changes, and build such additional fences himself at his own expense; and all probable and necessary expense for that purpose, being a proper subject for consideration in the assessment of damages to be awarded as compensation, must be taken as having been included in the compensation paid. The corporation was not bound by any law to build fences for any such purpose; though it might well happen that if the company did fence in their road as required by statute for other purposes, by erecting fences along either side of their road, such fences when built might also serve in part, incidentally, to enclose the plaintiff's fields; but the only consequence that could be visited upon the company, if they failed to erect such fences, would be, that they would thereby render the corporation liable for

the value of cattle and animals killed upon their track without any proof of negligence, but not at all for the destruction of the plaintiff's crops by the intrusion of the neighbor's cattle into his fields. It was insisted on the part of the plaintiff that the fences of the plaintiff had been thrown down to a greater extent than the width of the land condemned, or than was necessary for the purpose of constructing the railroad; but if this were so, it was the wrongful act and trespass of the sub-contractor and his servants, and wholly unauthorized by the corporation; and for any injury of this nature, as we have seen, they alone can be held responsible. And the same thing may be said in relation to the complaint that the laborers under Cochran had deposited earth upon the plaintiff's land beyond the line of the land condemned for the use of the railroad.

Again, the plaintiff complains in the second count, that a portion of his farm was injured by flowage of water occasioned by the raised embankment of the road-bed; but it is not alleged in the petition that this part of the work was constructed in a negligent, unskilful or improper manner. The answer set up as a defence to this count, that the company, by their charter, had power to construct their railroad in this manner; had acquired the right of way by condemnation of the land, and had paid the compensation assessed, including the advantages and disadvantages to the plaintiff's property. It did not appear that there was any natural watercourse there, which might have required a bridge or culvert to be built; but there was some evidence, that, upon complaint of the plaintiff on account of the accumulation of water on one side of the embankment, owing to the situation and configuration of the ground, the engineer had caused a pipe to be put through the embankment for the purpose of draining off the water, which did not prove effectual, and some one or two acres became too wet and marshy for cultivation. On this point the court gave the following instruction: "That if laborers, agents or servants in the employ of the defendant, while grading said road, negligently threw up

embankments of earth on the west side of said farm of plaintiff, thereby damming up the water, and causing the same to change its channel and overflow a part of said field outside of defendant's right of way, and thereby rendered the same unfit for cultivation, the jury may assess the damages thereby sustained."

This instruction should have been refused. The issue made on this count did not involve any question of negligence. The evidence tended to sustain the defence set up in the answer, and the finding should have been confined to the facts involved in the issue. (Alison v. Darton, 24 Mo. 343.) In the absence of any negligence, unskilfulness, or mismanagement in the construction of the embankment or the road-bed, the injury thereby done to the plaintiff's property must be considered as the natural and necessary consequence of what the corporation had acquired the lawful right to do; and such damages must be taken to have been included in the compensation assessed, or it was *damnum absque injuria*. The instruction was further objectionable as impliedly assuming that the corporation was liable for the negligent acts of the laborers, though employed under the sub-contractor. But the defendant cannot be held responsible for any damages occasioned by the negligence or by the trespasses of the employees and servants of the sub-contractor, whether in constructing the embankment, in taking down the plaintiff's fences, or in depositing earth upon his land.

Not having erected the fences required by the statute, the defendant would have been clearly liable, upon a count properly framed and coming within the jurisdiction of the court, for the value of the cattle killed on the track of the railroad, without any proof of negligence. The defence set up in the answer to the fifth count was not a valid defence, and the instructions asked upon it were rightly refused.

The other judges concurring, the judgment is reversed and the cause remanded.