1841.

IN THE MATTER OF THE LONG ISLAND RAIL ROAD CO. AND ALEXANDER M'CONOCHIE.

---

IN THE MATTER OF THE LONG ISLAND RAIL ROAD COMPANY AND ALEXANDER MCCONOCHIE.

---

Owners of lands which adjoin a rail road cannot compel the rail road company to put up a fence along such road, nor require them to contribute thereto. What are called *cattle guards*, at each end, are all that can be required.

As a rail road company is not advantaged by having fences along their road, there does not exist that mutuality of benefit between the company and owners of adjoining lands which can compel such company to make or contribute to the making of the fences.

Same principle, where either party chooses to forego a benefit.

No person can be compelled to enclose or fence in his own land; and he is not bound to contribute to the expense of his neighbour's fence, except where he afterwards encloses and takes benefit by the neighboring fence.

July 30, 1841.

Rail Road Company. Fences. "Cattle guards."

---

CASE of appraisement of damage in relation to land required for the construction of the Long Island Rail Road. The appraisers had made out their award without reference to fenc-

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

*ing;* and the Vice-Chancellor had appointed this day for the parties to produce witnesses and proofs, more especially in relation to the sufficiency and safety of what is called " cattle guards" and the use of them in the place or stead of side fences along the line of the rail road ; so as, indeed, to dispense with the necessity of making such side fences ; and, in case side fences should be found indispensable, then as to the cost of making and maintaining the same where the rail road passed through the land of the party now before the court, Alexander McConochie ; and by such evidence to enable his honor to determine the question concerning fences and to modify the assessment of the appraisers by allowing to the said McConochie an additional compensation or not as should appear to be just.                                    •

The Long Island Rail Road Company were represented by their president, Mr. *George B. Fisk ;* and

Mr. *McVean,* appeared for Alexander McConochie.

On behalf of the Company, James J. Shipman, a witness, deposed that he was the engineer of this company as well as of that of the Harlaem Rail Road ; and had been in the habit of constructing cattle guards on rail roads. That he considered them a perfect protection to the road against cattle, horses and swine from the highways. (Here a model was produced and the witness deposed that it was a correct model of a cattle guard across a rail road where it intersects a highway and where it intersects the fields or division fences of a farm.) Also that crops growing in fields adjoining the highway would be protected against cattle at large on the highway by means of this cattle guard; and so with regard to a cattle guard placed across the rail road in any division fence between different fields and between the owners of adjoining lands. That the witness considered a rail road just as safe without lateral fences enclosing the road as with them, the guards presenting a complete barrier against the passage of horses, cattle, sheep and swine. Also, that he had advised the Harlaem Rail Road Company to construct the guards in preference to making fences along the rail road and which they were then laying

down in Westchester county. The reasons of the witness for this were that where accidents had occurred to cattle, it had been generally where, by some neglect or design of the owners of the cattle, they had been suffered to get upon the road within the fences and when the train approached they would run along the fence and, being unable to escape, such fence would act as a foil and turn them on to the track where they were run over or injured. That the witness knew of no accident happening to cattle where there was no fence to prevent their escape from the lines of the road. That a company did not require to take as much land for a road where it was not fenced. That his experience in rail roads embraced seven years; the first cattle guards he saw were in one thousand eight hundred and thirty-six; and he believed they were not, at present, generally used upon rail roads; and as, now constructed, they were of recent introduction. *On cross examination*, he believed that Mr. McConochie's farm was bounded on one side by a highway. That there was no necessity for cattle guards, provided the rail road was enclosed by a fence, except at the highways. If a sufficient fence were put and kept up, then the cattle could not get on to the rail road; but if, from defect of fence, cattle did get on, then it were better there were no fence. That guards did not prevent the cattle of the owner from going over the road on to his own land.

John Leach, another witness on the part of the company, deposed that he had charge of the *locomotives* of the Long Island Rail Road Company; and had been in the habit of running engines on rail roads for seven or eight years. That there were a number of places on the Long Island Rail Road where there were no side fences and believed there never had been any there. He had met with a number of accidents from cattle, but believed there never was an accident of that kind where there was no fence at the side. He had frequently noticed, where cattle were near the track and feeding at those places, that the moment alarm was given or they saw the engine, they would run to get out of the way and escape from the side of the road; but if there was a fence, they were apt to cross from side to side and get in the way. That when he was running an engine and saw cattle where there was a fence, he lessened the speed of the engine; but where there was no

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

fence at the side, he did not do so and never met with any accident. That, in one year, on the Boston and Providence road, where it was well fenced and he had orders not to stop for cattle, he killed six cows and two horses; that where there were fences the animals would get on the road and it was impossible to keep them off; and hence he was of opinion that a road was safer from cattle and accident without a fence than with one. *On cross examination:* The witness said that at the highways the cattle guards were just as necessary whether the road were fenced or not and that these guards at the highways were no protection against a man's own cattle on his own land. Also, that a common farm fence along a rail road was not always sufficient to keep cattle off.

John Sutphen, another witness for the company, testified that he was the conductor of the train upon the Long Island Rail Road and had been so for five years. That his business had been always to go with the train up and down and to look after the safety of passengers and to guard against accidents. That he always had the most accidents where there was a fence on the sides of the road; and did not recollect any instance of running over or injuring an animal where there was none. And from his experience on this road he considered there was more safety against cattle where there was no fence than where there was one on each side. Had seen rails lying out of a fence which would have been called a good and sufficient fence.

It is not deemed necessary to refer further to the testimony, for that on the part of McConachie went mainly to *value*.

THE VICE-CHANCELLOR :—From the testimony of Shipman, Leach and Sutphen and from an inspection of the model exhibited, I am perfectly convinced that these " guards," properly constructed across a rail road, are effectual barriers to the passage of horses, cattle, sheep and swine along the track or within the lines of the road; and when connected, as the guards must be, with the exterior fences of a farm or with the interior division fences of fields crossing the road or any partition fence between owners of adjoining lands intersected by the rail road that they will as effectually prevent the ingress and egress of cattle or other domestic animals as the best of

farm fence will do. It is true that animals will not thereby be prevented from passing over the road from one side to the other nor along the road between any two of the guards; and where this may happen in any enclosed field, it can only so happen with the cattle or other animals of the owner of the field which he may turn or suffer to run therein. And whenever the rail road shall run across an enclosed field, it does not follow that the owner is deprived of the opportunity or advantage of using the land on both sides in common as one field at the same time, either for tillage or pasturage; all that he may require will be the privilege of crossing the rail road from one part of the field to the other (and this privilege to Mr. McConochie, the Rail Road Company avow themselves ready and willing to give.) If the rail road should cross the field in a deep cut or upon any considerable embankment, then, indeed, the land owner may be put to great inconvenience and, perhaps, be entirely prevented from crossing for ordinary farming purposes. But it does not appear that this will be the case with Mr. McConochie, and for whatever inconvenience he may be subjected to in this respect or from the manner in which his land may be cut up and his fields disfigured by the making and running of the road, as well as for the real value of the land taken, I must suppose the award of one hundred dollars is intended as a full compensation. This sum is not objected to on the ground of its insufficiency to cover the value of the strip of land and all such consequential damage, if any such there be. It is only insisted that Mr. McConochie is entitled, in addition, to have fences erected along side of the rail road, where it runs through his land, at the expense of the company. I am of opinion that such fences are not essential to the ordinary use of the farm in any branch of husbandry; and that, for these purposes, the construction of " cattle guards," wherever the exterior and interior fences of the farm intersect the road, will afford all the protection which may be necessary against the egress and ingress of cattle to and from the highways, the adjoining fields and other contiguous lands; and, therefore, that Mr. McConochie is not entitled, upon any such view of the case, to have fences (other than the cattle guards) erected in whole or in part at the expense of the company. I am also well satisfied, by the testimony of the wit-

1841.

IN THE MATTER OF THE LONG ISLAND RAIL ROAD CO. AND ALEXANDER M'CONOCHIE.

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

nesses, who speak from what they have seen and experienced on this and other rail roads for a number of years, that it is not necessary that a rail road should be fenced at the sides to insure the safety of persons and property in transit on the road against accidents from cattle getting thereon. Indeed, it is very clearly to be perceived that there is less danger of running over them, when they do get upon the road where there is no side fence to prevent their going off, than where there is such an obstruction. The law of self-preservation, creating fear or the dread of danger and a disposition to avoid it operates upon the animal instinct and they naturally diverge from the course of the road in their haste to escape ; and if a fence is in their way, it serves, in the language of one of the witnesses, as a foil to turn them back upon the road ; and it is only in such parts of the road as are fenced that accidents of this kind generally happen.

But, notwithstanding these facts, it is urged as a matter of legal right in the land owner to have his lands adjoining to a rail road running through them separated therefrom by a good and sufficient fence, to be constructed at the expense of the company in the first instance and, afterwards, to be deemed a partition fence as between owners of adjoining lands.

This is the point I have now to consider. In the case of the *Rensselaer and Saratoga Rail Road Company*, (4 Paige, 553,) the Chancellor speaks of an owner of land, through which a turnpike or a common highway is made, being obliged, from necessity, to make the fence along such roads to enclose his lands (unless he is willing to have his land open as a common,) for the turnpike company or the public have no interest to keep up such fences for the sake of the roads, because the running at large of cattle upon them cannot materially interfere with travel and ordinary use. In these cases, the land owner being compelled to make fences, which, but for the laying out of the turnpike or highway, he would not be obliged to make, is entitled to full compensation for the expense to which he is thus subjected. And the counsel in argument insists that the evidence, which proves there is more safety from cattle on a rail road when it is unfenced at the sides than when it is, only shows that the rail road company has no interest to keep up such enclosures ; and places such road upon the same

footing as a turnpike or highway and so would subject the company at once to the liability in such cases pointed out by the Chancellor. I cannot agree with the counsel in the supposed analogy or in the application of that principle. A rail road is not like a common highway or turnpike intended for general travel and the passage of all sorts of cattle. It can only be used as a particular mode of conveyance for passengers and goods. It admits of barriers placed, wherever needed, to obstruct the passage, at those points, of every thing except the moving power and its train; and when it runs through the land of an individual, it does not lay open and expose the land and growing crops to injury as does a common travelled road. The Chancellor further observes that the manner in which a rail road is to be used renders it necessary that the company should secure their road against the encroachments of cattle from adjacent lands so as thereby to ensure the safety of the persons and property passing upon the road; and he considers that the obvious mode of doing this is by fences. It has already been shown, from the evidence before me, that this security can be attained better without resort to longitudinal fences than with them, unless, indeed, fences should be so strong and firmly built as to be completely cattle proof. What are deemed good and sufficient fences among farmers for all ordinary purposes, it is very evident do not always prevent cattle from getting on the road. How often are fences broken or thrown down by cattle, which officers of the town, called fence-viewers, adjudge to be good and sufficient, so as to justify the distraining of the cattle damage feasant for the trespass? Such cases occuring show that a good and sufficient fence in the law is not always capable of restraining cattle. A rail road company could not be required to put up or pay for any other; and such, it is shown, do not afford the degree of security required. They had better then be dispensed with and the road left to that sort of security which consists in cattle having free and unobstructed egress from the road when alarmed, as they are sure to be, by the approach of the engine.

Then, if the Long Island Rail Road Company have no interest in supporting fences for the protection and security of their road, upon what principle can Mr. McConochie call upon them to contribute to the making of such fences? It is only

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

1841.

IN THE MATTER
OF THE LONG
ISLAND RAIL
ROAD CO. AND
ALEXANDER
M'CONOCHIE.

upon the ground of mutuality of benefit that the equitable claim of contribution is founded; and it is upon that principle, the Chancellor held, in the case as it stood before him, that the Rensselaer and Saratoga Rail Road Company, being as deeply interested as the land owner in having partition fences, was bound to make one half. But when that mutuality of benefit does not exist or either party chooses to forego it and to dispense with an enclosure of his lands, no just claim of that sort can arise.

By this proceeding to take a strip of land for the use of the Long Island Rail Road, the company are vested with the title as owners and proprietors of the soil; and between them and Mr. McConochie it becomes a case of ownership of adjoining lands. At common law, no man is bound or can be compelled to enclose his land; he may, in the freedom of his will, leave his lands open and unenclosed by any fence and, at the same time, use them for tillage, pasturage or in any other way that he best can, being responsible for any injury which his beasts, when wandering from his land, may occasion to others; while he will be entitled to an action for any voluntary trespass which may be committed upon him (1 Cowen's Treatise, 381, 2d edit. ;) and the statute law of this state in relation to "division and other fences," (1 R. S. 353, sec. 30,) expressly recognizes the right of an owner of lands adjoining those of another to let his lands lie open; and so long as he chooses to do so, no obligation rests upon him to contribute to the division fence which his neighbor may think proper to erect between them (1 R. S. 346.) It is only when he afterwards incloses so as to take to himself some benefit of the fence along the division line as a part of the inclosure that he can be called on to pay for one half of it. And why should not this law apply to cases like the present? The Chancellor considered that this 30th section of the statute did not apply, in terms, to *rail roads*, because he says, the lands of the rail road company are not, in fact, enclosed at those points where the road is crossed by the public highways. It is very evident that this was said in reference to the liabilities imposed on parties by the statute to contribute where lands are enclosed, but it has no reference to the exception at the close of the section recognizing the privilege of leaving lands open and unenclosed. This case, I think, is

taken out of the operation of the decision made by the Chancellor so often referred to, by reason of the facts which are in evidence before me in relation to the utility of "cattle guards" and the security of the rail road without fences, which experience has verified since the Chancellor's decision was made; and it follows that so long as the rail road company choose to have the road unfenced at the sides, they cannot be called upon to do any thing towards fencing it by an adjoining owner. But should the company hereafter find it necessary, for their own interest or convenience, to have the road enclosed, they will then bring themselves under the statute and be compelled to make or pay for the making of one half thereof; and should there be any town law or regulation adopted (if any such there can be) under the authority of the statute which confers powers on the inhabitants assembled in general town meeting, requiring partition fences to be made at all events between the rail road and the lands of adjoining owners, then the company will be bound to conform to such regulation provided it be lawfully binding upon them.

I must allow the report and assessments of the appraisers to stand without any modification or amendment, except that, in the order confirming it, I must enjoin it as a duty upon the Long Island Rail Road Company to construct, at their own expense, proper and sufficient cattle guards across and upon the road wherever it intersects the exterior boundary lines of Mr. McConochie's land and the interior division fences thereof upon the plan of the model exhibited; and that the company continually hereafter keep up and support those guards or barriers in a substantial and durable manner, as well as that the company grant to him and his heirs and assigns the privilege or easement of crossing the rail road at such and so many places as he may designate on his land, for the convenience of farming business thereon and that the company prepare and make those crossing places at their own expense.