## WARD v. PADUCAH & MEMPHIS R. Co.

*(Circuit Court, W. D. Tennessee.    ———, 1880.)*

1. PRACTICE IN EQUITY—REFERENCE.—A case should not be referred to a master until the issues made by the pleadings have been settled by a decree. It is not proper to try those issues upon exceptions to the master's report.

2. TORTS—DAMAGE TO CROPS BY ANIMALS OF THE OWNER—WHEN ADJOINING PROPRIETOR LIABLE.—If crops be damaged by the animals of the owner, an adjoining proprietor can only be liable when, by some prescription, contract, or statutory duty, such liability is imposed on him.

3. RAILROADS—FENCE LAW—CATTLE-GUARDS.—The ordinary fence laws of Tennessee do not apply to railroad companies, and there is neither a common-law nor statutory obligation on them to construct or maintain cattle-guards for the protection of crops growing on the cultivated lands through which their roads pass. Neither was the act of 1875, c. 64, intended to apply to railroad companies, although the land on which the track is built is within " one general enclosure," made by joining the fences of the farmer to the cattle-guards of the railroad. These laws were intended for adjoining land owners engaged in agriculture, who are mutually benefited as well as bound by them.

4. SAME—IMPLIED CONTRACT.—In the absence of a contract, or charter obligation, or some statutory duty to maintain cattle-guards, none will be implied from the fact that the company has constructed them along the line of road where it enters and leaves cultivated fields, unless the lapse of time has raised the presumption of a grant or covenant.

5. CONTRIBUTORY NEGLIGENCE—STRAYING ANIMALS—DUTY OF THE OWNER OF THE CROP.—The owner of crops, having knowledge that straying animals may pass over defective cattle-guards and destroy the crops, cannot recover for their destruction without using every means an ordinarily prudent person would use to protect them. It is contributory negligence not to do this.

In Equity.

*Finlay & Peters,* for petitioner.

*Gantt & Patterson,* for defendants.

HAMMOND, D. J. The practice adopted in this case, of referring the petition to a master before any decree settling the rights of the parties upon the issues made by the pleadings, has resulted in trying intricate questions of law and fact

upon exceptions to the master's report, which does nothing more than ascertain the *quantum* of damages alleged to have been sustained. It is a practice that has been justly condemned as intolerable, is certainly inconvenient and perplexing to the court, and should not be resorted to in the future. *Cobb* v. *Jameson*, 1 Tenn. Ch. 604; *Eubank* v. *Wright*, 2 Tenn. Ch. 538; *Patten* v. *Cone*, 2 Leg. Rep. (Nashville,) 173.

Technically, the decree of reference is an adjudication against the receivers that damages have been sustained for which they are liable, and, strictly taken, the only question would be as to the amount; but such has not been the understanding of the parties, and I have considered the questions as if the case were before me upon the pleadings and the proof.

The petition is filed to recover damages to the petitioner's crops by straying animals, through the alleged negligence of the receivers of this court, while operating the railroad. The claim is for about $1,581, and the master has allowed $973.27, the receivers insisting that at most the proof shows only $372.50. Exceptions to this report are filed by both sides, and they raise the questions to be determined. The negligence complained of was a failure to keep the cattle-guards on the line of petitioner's field, through which the road passes, in a condition to exclude the animals. The defences are these: (1) That the railroad company was under no obligation to fence or guard the crops of petitioner; (2) that the cattle-guards were not negligently kept; (3) that the damage occurred by the negligence of the petitioner herself.

The proof on some points is very conflicting, but I think the following statement contains the facts proved, and are those upon which the rights of the parties must be determined:

The petitioner, being the owner of a field of about 500 acres of enclosed and cultivated land, granted the railroad the right of way of the necessary width, not exceeding 100 feet on each side from the center of the road, and agreed in writing to make a deed to the right of way whenever the

road was permanently located. This memorandum of the grant contains no covenant or reservation binding the company to keep and maintain a fence between the lands so granted to the company and the adjoining lands of the petitioner. It is conceded that the charter of the company imposes no such obligation, and whether the general or statute laws of the state do or not will be hereafter considered.

The company, in constructing its road, did build cattle-guards at the points of entrance and exit into this and all other fields through which it passes, and the fences of petitioner being joined to the cattle-guards, the enclosure of the railroad land and the two now separated parcels of the petitioner was complete. Near one of these cattle-guards was a highway along the fence and across the railroad, and on either side of the field unenclosed lands. These cattle-guards were allowed to fill up, so that straying animals could cross them, and by this means cattle entered the field and committed the damage complained of here. The cattle and hogs doing the damage mostly belonged to the petitioner, as she says herself in her deposition, and there is nothing in the proof to show what proportion of the damage was committed by other animals than her own. The damage was mostly done by hogs.

The proof is conflicting on the question of negligence, but I think establishes that these guards were not properly attended to, and were allowed to fill up, and the animals entered the fields over them. The proof shows that the damage was not committed at one time, but the animals habitually trespassed on the crops for two years. Newton Ward, a son of petitioner, says he drove the animals out of the field frequently,—five or six times, he thinks,—until he saw it was useless, and let them alone. He says the trespass began in June, and continued until the crops were nearly ruined. He handed a note to one of the witnesses to be given to the superintendent, informing him of the condition of the cattle-guards, which that witness says was delivered.

Another witness for petitioner says he informed the railroad hands about the trespasses, and others say the train-

hands could see the hogs in the field from the cars. The railroad hands say they knew nothing of the trespasses, except at the time the note was sent, when the guards were cleaned out. It does not appear when this note was sent, whether at the beginning of the trespasses or later on, but the petitioner's witness, who carried the note, says Givens, the superintendent, said that if Mrs. Ward would send some hands and have the cattle-guards cleaned out it would stop the damage. Mrs. Ward says she "did not think it her business to repair the cattle-guards." The proof shows that six or eight hands could clean them out in a day; some of the witnesses say half a day, others longer. The description of the guards shows that it was no very difficult or costly operation to clear them of the filling and keep them clear. On the whole, this proof establishes that Mrs. Ward neither kept her animals up, kept them out of the fields by other means, or cleared out the cattle-guards; but, relying on the theory that the company was liable for the damages, she permitted her own animals to destroy her crops, supposing she had performed her whole duty in the matter when she gave the company's agent notice of the condition of the cattle-guard. It is proper to say that while the petitioner claims for damages to the crops of two years, the proof is mostly confined to the crop of one year.

The anomaly of this case is that the petitioner is seeking to recover, from an adjoining land owner, damages done to her crops *by her own animals.* The owner or keeper of animals is generally liable for damages done by them when they are trespassers. *Fletcher* v. *Rylands,* L. R. 1 Exch. 263, in which the opinion by *Blackburn,* J., traces the earliest cases for the doctrine as far back as 20 Edw. IV. It is there said that "if the owner of 200 acres in a common moor enfeoffs B. of 50 acres, B. ought to enclose, at his peril, to prevent damage *by his cattle* to the other 150 acres; for, if his cattle escape thither, they may be distrained damage feasant. So the owner of the 150 acres ought to prevent his cattle from doing damage to the 50 acres at his peril," (citing Comyn's Dig. tit, "Droit M." 2, and Dyer, 372*b*;) 1 Thomp. Neg. 27;

and, "if A. and B. have lands adjoining, where there is no enclosure, the one shall have trespass against the other on the escape of their beasts respectively." Id. 28.

This would seem to preclude the idea of one having a cause of action against another for trespasses by one's own cattle on one's own land or crops, unless there be some extraordinary liability, growing out of other obligations than those imposed upon adjoining land owners towards each other. Mr. Addison says that the making of a fence by a land owner does not raise any inference that the fence was intended for the benefit of his neighbor, although the fence prevents his neighbor's beasts from trespassing as well as his own, for it is for his own benefit to prevent his beasts from trespassing on his neighbor. 1 Add. Torts, (4th Ed.) 149. And, where statutes or self-interest require him to protect his land with fences from straying cattle, still less can there be any inference from the mere building of the fence that there is an implied contract to maintain it for the benefit of his neighbor who happens to be protected by it. There may be, unquestionably, a valid prescription binding the owner of land to maintain perpetually the fence between him and the adjoining proprietor, but, in the absence of some covenant or grant, this servitude can only be established, like other prescriptions, by long-continued, peaceable, and uninterrupted enjoyment for the length of time necessary to raise the presumption of a grant or covenant. Id. and notes; Id. 96, and notes.

The petitioner here might, in consideration of her grant of the right of way, have imposed this obligation on the company, or she might have demanded as a consideration money enough to cover the costs of the necessary fences in the changed condition of her fields; but, not having used this precaution, she cannot supply the want of it by any implication of a contract imposing the obligation.

An American railway company is not bound to fence its railway, as an American farmer is bound to fence his fields, and in the absence of statutes imposing the obligation it does not exist. *Railroad* v. *Skinner*, 19 Pa. St. 298, 303; *Clark* v.

*Railroad,* 36 Mo. 202; *Dean* v. *Railroad,* 22 N. H. 316; *Williams* v. *Railroad,* 2 Mich. 259; 1 Add. Torts, 214, and notes; Cooley, Torts 654; 1 Redf. Ry. 483 *et seq.;* Id. 499 *et seq.;* Sherm & Redf. Neg. 508 *et seq.;* 1 Thomp. Neg. 503, 514.

It was judicially determined, in one case, that for the purposes of a railroad the land on which it was built had better remain without fences, there being less danger of killing cattle that would be penned up, so to speak, by the fences, and consequently less danger to trains and travelers. *Railroad* v. *McConochie,* 3 Edw. Ch. 487. And, for want of mutuality of benefits, it was, therefore, ruled that the equitable doctrine of contribution for partition fences did not apply as between a farmer and a railroad owning adjoining lands. Id. And, in our own state, it has been held that our fence laws do not apply to towns, but to agricultural localities, and this upon reasoning which will exclude their application to railroads which have no beasts to trespass on others, and no crops to protect. *Lightfoot* v. *Grove,* 5 Heisk. 473; *Staub* v. *Fantz,* 11 Heisk. 766. It may be very well doubted, therefore, whether, in the absence of express language applying the fence laws to railroads, they are to be held bound by them. Indeed, it may be doubted whether the legislature could by law impose the servitude upon them of keeping up fences for the benefit of adjoining land owners. In consideration of a charter it might be done, or possibly by the exercise of the police power of protecting life and property while using the roads, the protection to crops being merely incidental. *Thorpe* v. *Railroad,* 27 Vt. 140; *Trice* v. *Railroad,* 49 Mo. 438.

I think, therefore, in view of these decisions, that, inasmuch as our fence laws do not in express language apply to railroads, nor indicate any purpose of adopting, as a police regulation, a requirement that railroads shall be fenced, they do not impose on railroads in this state any obligation to keep and maintain fences, either as partition fences or otherwise. This company was, therefore, in the absence of any charter obligation, or of any contract express or implied, or of any prescription binding it, not bound to construct or maintain

cattle-guards for the protection of Mrs. Ward's crops. There are courts, however, that hold that fence laws impose the same obligation on railroads as other adjoining proprietors; and perhaps, where the company owns the land, and does not possess, as in this case, a mere right of way over land belonging to the original proprietor, there may be sound reason in saying that they are liable to the same laws that govern adjoining proprietors of land, and that the uses to which it is put cannot alter the case, though the Tennessee cases before cited, as to partition fences in towns, seem to indicate a different view. 1 Redf. Ry. 486, 499. I have considered this case in that aspect, and, if these statutes do bind the company, it should be determined what are the rights of the parties on the facts of this case.

We have seen that at common law there is no obligation on adjoining proprietors to fence their lands, and certainly none to fence for each others' benefit. Neither the Code, nor the subsequent acts amending it, are compulsory in any other sense than that a farmer, who fails to build a legal fence, is deprived of any right of action against the owners of straying cattle trespassing on his lands. T. & S. Code, 1682–1693, Acts 1877, c. 35. Adjoining proprietors are at liberty, if they see fit, to dispense with fences altogether. *Aylesworth* v. *Herrington*, 17 Mich. 417, 424; *Tewksbury* v. *Bucklen*, 7 N. H. 518. If all that is claimed for the operation of the fence laws be admitted, it only amounts to this: that the petitioner here would be exempt from liability to the railroad for any trespass her animals should commit in straying on its lands, because the company has not fenced them, as the law requires. If the petitioner had made partition fences, under the circumstances mentioned in the statutes, the adjoining land owner might be compelled to pay his part of the cost and repairs. T. & S. Code, 1687.

But there is nothing in the Code to compel an adjoining owner to make either partition or other fences for the benefit of his neighbor. The company was not, therefore, bound to construct a fence or cattle-guard, or to maintain it. If one construct a fence upon his own land, he may remove it at

will. If, however, his neighbor has, with his consent, joined his fence to it, and its removal would expose the neighbor's crops, he should give notice and allow time for protection before removal; but this imposes no obligation to keep up the fence, or any liability for failure to do so. Neither the Code, nor the act of 1877, *c.* 35, makes an adjoining land owner responsible in damages for a failure to keep up his share of the partition fence, nor makes any apportionment of the fence for each to keep up, from which this liability for failure to repair could be implied. The other owner may erect and repair and collect the cost. Under a similar statute in Alabama, from which ours is largely copied, it was held he had a right of entry to make repairs. *Henry* v. *Jones,* 28 Ala. 385. Hence, there is no other liability, under these statutes, than for a share of the costs of repairs. The statutes in some of the states proceed upon the other plan, and assign certain portions of the fence to each owner, and he becomes liable in damages for failure to repair, but our Code does not.

We come now to the act of 1875, *c.* 64, p. 75, the first section of which enacts, among other things, that "if either of the parties, having a joint or partition fence, refuse or neglect to keep up his part of said fence in good repair, he shall be liable for all damages the other may sustain to his enclosures or crops by trespassing stock in consequence of such refusal or neglect." The second section enacts that "where there is no partition fence between the owners of any lands in this state, and said lands being in one general enclosure, then each party shall be liable to the other for any trespass or damages upon or to his land or crop thereon caused by the neglect or failure of said other party to protect the said enclosure or crop on his or their side of said general enclosure."

This case does not fall within the first section at all, because this is not a *partition* fence, (the cattle-guard,) which is defined by statute to mean "fences on the line between lands owned by different persons." T. & S. Code, 1691. No provision is made for designating by assignment of fence viewers or otherwise, as is usual in statutes proceeding on this principle of compensation in damages, (for the first time in this state

adopted by this act,) the particular portion of the fence each owner is to be responsible for, and I do not see how either is to be held for any particular portion without such provision. However, it is clear the first section cannot apply to this case. The case does undoubtedly fall within the letter of the second section, because the cattle-guards and the adjoining fencing on the company's land, when joined to Mrs. Ward's fences, place the railroad land and her fields within "one general enclosure."

As before remarked, it is my judgment that this statute never was intended to apply to land on which a railroad is built, surrounded by and enclosed with fields like this, and for the manifest reason of a want of mutuality of benefit. The company derives no benefit from this enclosure. It may keep cattle outside of this particular part of the track, but the road is open to all cattle within the enclosure, and Mrs. Ward has an undoubted right to keep such cattle there as she chooses. There is no benefit to the railroad, nor protection against cattle trespassing on its land, nor any need of it, in the absence of a fence along the whole road. If Mrs. Ward's cattle, being in her field, or other cattle being there by her permission, or through her neglect to keep up her part of the fences around the enclosure, were to go upon the railroad and cause the wreck of its trains, there could be no recovery against her by the company. The statute was clearly only intended to apply to farmers mutually benefited by having lands within a common enclosure, which they cultivate or otherwise use for agricultural purposes. It is the merest literalism to apply the statute to a case like this.

But, again, if it be conceded that this statute does apply to a case like this, the petitioner cannot recover, because of her contributory negligence. It may be admitted in this connection that the common-law obligation on every person to restrain his beasts on his own land has been so far modified that no negligence can be imputed if they are suffered to run at large. *Kerwhacker* v. *Railroad,* 3 Ohio St. 172; *Railroad* v. *Waterson,* 4 Ohio St. 424; *Seeley* v. *Peters,* 10 Ill. 130; *McAfee* v. *Crawford,* 13 How. 447, 457; *Alger* v. *Railroad,*

10 Iowa, 268; Cooley on Torts, 337. This doctrine is recognized in the case of the *Railroad* v. *Smith,* 9 Heisk. 860, 865, as the effect of our fence laws. These cases were those of injury to animals straying on the railroad, and the better rule seems to be that in this country it is not such contributory negligence to allow animals to run at large as will exempt the railroad company from liability for injuring them. But it is carrying this doctrine much further than these cases justify, to hold that this privilege of permitting animals to run at large is a right which the law will protect to the extent of allowing damages committed by them on the owner's own crops, lest to refuse the damages would be to deprive her of the privilege of permitting them to run at large. The privilege is only permissive, and the only effect is that the owner of animals is not liable as a trespasser if the lands on which they stray are not lawfully fenced. It gives no right of common or depasture in the land. The animals are trespassers, but the owner of the land cannot recover of the owner of the animals for the trespass, except under certain conditions which the statute law has imposed. *Knight* v. *Abert,* 6 Pa. St. 472; *Railroad* v. *Rollins,* 5 Kan. 167; *Calkins* v. *Matthews,* Id. 191; *Herold* v. *Myers,* 20 Iowa, 378; *Williams* v. *Railroad, supra; Railroad* v. *Skinner, supra.*

But, be this as it may, it was the grossest negligence in the petitioner to turn her animals out when she knew that they could and would pass the cattle-guards and destroy her crops. If she had had a contract with the company to maintain the cattle-guards it would have been her plain duty to lessen the damages by keeping up the hogs and suing for their keep, or whatever other damage that would cause her. Moreover, she might have cleaned out the cattle-guards and charged the expense of the process to the company. It is no answer to this to say that she would have been a trespasser. She probably would not have been, but until she made an effort in that direction, and was warned off, it was folly to stand idly by and see her crops destroyed, with no effort made to save them. That course was suggested to her by some of the employes of the company, and she says herself

"that she did not think it her business to clean out the cattle-guards." In this she was mistaken. She might, at small expense compared to the heavy damages she claims, have employed boys or men to watch these gaps day and night, and thereby have saved her crops. In some way it was her duty to have protected them, and her failure was contributory negligence, under any rule which may be adopted on that subject. Negligence may consist in either failing to do what, under the circumstances, a reasonable and prudent man would ordinarily have done, or in doing what he would not have done. The question in such cases is—*First*, whether the damage was occasioned entirely by the negligence or improper conduct of the defendants; or, *second*, whether the plaintiff himself so far contributed to the misfortune, by his own negligence or want of ordinary care and caution, that, but for such negligence or want of care and caution on his part, the misfortune would not have happened. *Railroad* v. *Jones*, 95 U. S. 439, 442; *Trow* v. *Railroad*, 24 Vt. 487; *Stuck* v. *Railroad*, 9 Wis. 202; 21 Albany Law Jour. 404.

The mistake of petitioner is that she seeks to impose too exclusively on the defendant company the duty of protecting this crop, and to relieve herself too entirely from all responsibility in the matter. If one negligently leave a gate open, and the owner sees it, and passes it frequently and wilfully and obstinately, or, through gross negligence, leaves it open all summer, and cattle get in, it is his own folly. *Locker* v. *Damon*, 17 Pick. 284, 288. And, if the party injured has it in his power to take measures by which his loss may be less aggravated, this will be expected of him. The law will not permit him to throw a loss upon another arising from causes for which the latter may be responsible, if by common prudence the damage could be prevented. *Miller* v. *Mariners' Church*, 7 Me. 51, 56; *Simpson* v. *Keokuk*, 34 Iowa, 568; *Little* v. *McGuire*, 38 Iowa, 560. Where trespass was committed by wrongfully removing part of a fence, damage to crops was refused because the plaintiff had neglected to build fences for their protection. *Smith* v. *Johnson*, 76 Pa. St. 191. In an action for a breach of a specific contract the party injured is

bound to use proper means and efforts to protect himself from unnecessary loss or damage, and can charge the party only for such damages as by reasonable endeavors and expense he could not prevent. *Walker* v. *Ellis*, 1 Sneed, 514. Where there was a stipulation to keep a dam in repair, the cost of repairs is the only measure of damages, not damages for the mill lying idle. *Fort* v. *Orndoff*, 7 Heisk. 167. There is nothing in the principle adopted in *Dush* v. *Fitzhugh*, 2 Lea, 307, to change the rule above laid down on the subject of contributory negligence. The proximate cause of the injury to the petitioner's crops was her negligence in turning her hogs out when she knew they were destroying her crop, or failing to put them up after she saw them in the fields, or otherwise protecting her crops; and the negligence of the defendants was only remote. I do not overlook the fact that there were some other animals than her own with hers; but, as to these, she could have kept them out in many ways, and she should have done it.

Petition dismissed at costs of petitioner.